NOT DESIGNATED FOR PUBLICATION

No. 120,295

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of
A.D.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; GREGORY D. KEITH, judge. Opinion filed August 13, 2021. Affirmed.

*Jordan E. Kieffer*, Jordan E. Kieffer, P.A., of Bel Aire, for appellant.

*Matt J. Maloney*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GREEN, P.J., BRUNS, J., and MCANANY, S.J.

PER CURIAM: A.D. confessed to stabbing to death a transgender woman. After the trial court denied A.D.'s motion for self-defense immunity, a jury convicted A.D. of second-degree murder. He challenges the court's self-defense ruling. Also, he argues that he was denied his right to a speedy trial and disputes the designation of this case as an extended jurisdiction juvenile prosecution. We find no reversible error, and for this reason, we affirm.

FACTS

A.D. was 16 years old when he went to Tyreece Walker's Wichita apartment on May 1, 2016. A.D. stabbed Walker to death in the apartment that night.

1

On May 4, 2016, the State charged A.D. with voluntary manslaughter. That case was set for a January 2017 jury trial. The court continued that trial date until March 13, 2017, because of a shortage of judges. Then, on March 1, 2017, the State amended the charge against A.D. to second-degree murder. The trial was continued again. On July 26, 2017, the State learned that the coroner would be unavailable to testify the week of the jury trial beginning July 31, 2017. The State asked for a continuance, but the trial court ruled that the State failed to show good cause. As a result, on July 31, 2017, the State dismissed the charges against A.D.; it refiled the case that same day, again charging A.D. with second-degree murder for killing Walker.

In August 2017, A.D. moved for immunity from prosecution under K.S.A. 2015 Supp. 21-5231(a). A.D. argued that he was immune from prosecution because he justifiably used deadly force, arguing that he reasonably believed that deadly force was necessary to prevent Walker from raping or sodomizing him. The State opposed the motion. The State argued that the evidence did not support A.D.'s claim of self-defense.

The trial court held a hearing on A.D.'s motion for immunity from prosecution. Dr. Scott Kipper, a Sedgwick County deputy coroner/medical examiner, testified first. Dr. Kipper performed Walker's autopsy. Dr. Kipper testified that Walker had 140 "sharp force injuries," including 19 stab wounds and 121 incised wounds. Walker also had "some abrasions and lacerations of [her] head and some abrasions of [her] torso and [her] upper extremities." Dr. Kipper also testified that Walker had incised wounds on her hands and forearms that "could be" consistent with defensive wounds. On cross-examination, Dr. Kipper admitted that "there's no way to tell for sure what [Walker was] doing at the time [she] received the wounds."

Next, Wichita Police Department crime scene investigator Chris Engle-Tjaden testified. Engle-Tjaden testified that he inspected the contents of A.D.'s father's car, including a white plastic trash bag found in the car. The plastic trash bag contained items

later identified as belonging to A.D. The bag contained black sneakers, a green plaid shirt, a pair of jeans, a pair of gray athletic shorts, and an ornamental dagger. Each item contained bloodstains, particularly the shirt and jeans which were "heavily saturated" with blood. Engle-Tjaden testified that he also found a camouflage coat in the car's back seat. The inner lining of the coat had apparent bloodstains. In the coat's pockets, Engle-Tjaden found two pocketknives and the sheath for the ornamental dagger. One of the pocketknives also had apparent bloodstains on it.

Then, Charles Ulrich, a former Wichita Police Department crime scene investigator, testified. Ulrich photographed A.D. at the police station on the night of the stabbing. Ulrich stated that A.D. complained of pain on the right side of his head, but Ulrich could not see anything that would have caused this pain. Ulrich admitted that A.D.'s hairstyle made it difficult to see his scalp, but that there was no visible blood or "anything wrong" on the right side of A.D.'s head. Ulrich testified that A.D. had a 30-millimeter scrape on the middle of his upper back, and "injuries to the right palm, the top of the right hand, the left palm, and the top of the left hand." Ulrich testified that he was not qualified to determine if A.D.'s injuries were defensive or aggressive wounds.

Ulrich also processed Walker's apartment at about 1:15 a.m. on May 2, 2016. Ulrich testified that he found blood on the interior door frame of the apartment building, as well as the stairwell leading to Walker's apartment. Inside Walker's apartment, Ulrich found blood on a kitchen wall. Ulrich also found blood on the floor of the hallway to the bedroom. Walker's body was in her bedroom on the floor; she was nude except for a sports bra. A large amount of blood was in the bedroom: on the bedsheets, on the footboard of the bed, on the floor, on the wall, and on a television stand. Ulrich found a black Chicago Bulls T-shirt, one sock, and a pair of underwear sitting near a bench behind the bedroom door. The shirt and underwear had blood dripped or splattered on them. Ulrich testified that an overturned candle warmer holding a candle with pink wax was on the bedroom floor. Broken glass, a dildo, and handcuffs were on the bedroom

3

floor next to Walker's body. The trial court admitted the photographs that Ulrich took of the scene.

Detective Michelle Tennyson testified next. She recounted her May 2, 2016 interview with A.D. She testified that she offered A.D. the opportunity to be examined by a Sexual Assault Nurse Examiner (SANE), but he declined after she explained what it would entail.

Next, A.D. testified and provided his account of the evening. He testified that he first met Walker on April 30, 2016, when he and a male acquaintance went to Walker's apartment "for approximately three minutes." While he was at the apartment, he noticed the charge on his phone battery was 98%. So he plugged in his charger and charged his phone. According to A.D., during this three-minute encounter with Walker, he immediately developed a dislike for her.

He testified that on the evening of May 1, 2016, he told his younger brother that he was going up the street to get his phone charger. He left his house and walked to Walker's apartment. He wore "a button-up shirt, a Chicago Bulls shirt, jeans . . . gray shorts underneath [the] jeans. Red Bud Light underwear. Black Jordans and white socks . . . [a]nd a camouflage coat."

After A.D. knocked on Walker's door and explained he was there to retrieve his charger, Walker invited A.D. inside. At Walker's request, A.D. removed his shoes at the front door. Walker told A.D. that the phone charger was in the bedroom; so the pair walked towards the bedroom. A.D. said that Walker flirted with him as they walked, calling him a "Chocolate Knight."

A.D. testified that once they were in the bedroom, Walker told him the charger was on a bench. According to A.D., when he leaned over the bench to pick up the

charger, Walker punched him in the head. Then, A.D. "stood up, pushed [her] and punched [her] in the chest and tried to take off running" but he slipped on a carpet and fell onto the floor. Then, A.D. said Walker "charged [him] and tried to pull [him] back by [his] pants." According to A.D., the process of Walker grabbing his pants and him trying to escape caused him to "wiggle out of" his jeans, athletic shorts, and underwear. Then, A.D. testified that Walker pulled A.D. by his shirts, which caused A.D. to "wiggle[] out of [his] shirts," leaving him entirely naked and on the floor.

While he was on the floor on his stomach, A.D. said Walker "kept trying to advance, and [A.D.] felt what [he] thought was [Walker's] penis on [his] thigh." Walker's penis was erect. A.D. said that he then noticed that the foot-long decorative dagger had fallen out of his coat pocket onto the floor. So he grabbed it and when Walker "advanced again," A.D. "just started to stab [her]." A.D. stated that at some point during the struggle, Walker's basketball shorts came off and she was just in her "tank top and nothing else." The whole incident "happened pretty fast." According to A.D., he used only the ornamental dagger to stab Walker; he used neither of the two other pocketknives that was in his possession.

When A.D. was stabbing Walker, Walker said, "'I'm dead'" and A.D. "really panicked" and told Walker, "'I'm going to get you help.'" Then A.D. "gathered all the clothes [he] could see, and [he] put on what [he] could, and [he] hurried up. [He] went to get [his] shoes. And [he] bumped into the wall a couple times. [He] went and got [his] shoes, put [his] shoes on." A.D. testified he put only his shorts and coat on before leaving the apartment. Then A.D. walked to a friend's apartment who lived in the same complex as Walker. According to A.D., he told the friend that he had gone to Walker's apartment to get his charger. But Walker tried to rape him while he was there; he needed the friend to call 911.

5

A.D. stated that the friend insisted on calling A.D.'s mother before she would call 911. A.D. spoke to his mother on the phone. His mother told him that she would leave work to meet him at the friend's apartment and call the police. After the phone call, the friend told A.D. to take a shower, A.D. did so. Then, the friend put A.D.'s blood-soiled clothing in a white trash bag; she gave A.D. a clean set of clothes to wear. After A.D. showered, his mother arrived and called the police. The police came to the friend's apartment. A.D. told the police his story and the police asked him to show them where Walker's apartment was. A.D. did so.

A.D.'s younger brother testified and confirmed that on May 1, 2016, when it was "just about to get dark," A.D. left the family's house and said he was going to go get his charger.

A.D.'s mother testified. She said that on the evening of May 1, 2016, she was at work at a nursing home in Andover. At work, she received a call from an unknown number. When she answered, it was A.D.'s friend's mother. The caller put A.D. on the phone, and A.D. told his mother that "someone raped him, and he tried to get away from the person and winded up having to stab the person that raped him." She left work and drove to the apartment where A.D. was, which took less than 30 minutes. There, she found A.D., his friend, and his friend's mother "in a daze." She asked why nobody had called the police. Then, she called 911. She remained on the phone with the dispatcher until police arrived at the apartment.

On cross-examination, she testified that when she called her home around 5 or 6 p.m. on May 1, 2016, A.D.'s little brother answered the phone and stated that A.D. was not there because he had gone down the street to get his charger. She testified that she received the call from A.D.'s friend's mother at about 8 p.m. that night. She testified that A.D. told her on the phone that someone had raped him—not that someone had merely tried to rape him.

6

At the end of the hearing, the trial court asked the parties to submit further briefing, as well as proposed findings of fact and conclusions of law. On November 20, 2017, A.D. filed a memorandum in support of his motion for immunity. The State responded with its proposed findings of fact and conclusions of law on November 21, 2017. On November 22, 2017, the court held a brief second hearing on A.D.'s motion for immunity; both parties made closing arguments on the issue. A.D. argued that "there's been no evidence provided by the State to show that the occurrence didn't happen exactly as [A.D.] said." The court denied A.D.'s motion. The court ruled that A.D.'s use of force "was not statutorily justified." The court stated:

> "There is no physical evidence that an attempted sexual assault occurred. There is no DNA of the Respondent on the penis of Walker. There was no sexual assault exam, as the Respondent rejected such.
> "There was testimony that none of the Respondent's clothes were torn or stretched but were blood saturated.
> "There was testimony that could not tell if there was injuries to the Respondent's hand. Also, could not tell if there was injuries to—excuse me. Could not tell if there was injury to Respondent's head. I apologize. There was testimony there were no injuries on the Respondent. Testimony that Walker had no injuries consistent with a fight."

The court concluded that the conflicts in the evidence presented were best left to a jury to resolve.

On January 8, 2018, A.D. moved to dismiss the case against him for violating his constitutional due process and speedy trial rights. He alleged that the delay of 615 days since his arrest violated his speedy trial rights and that the State's failure to timely turn over evidence violated his due process rights. The trial court held a hearing on the motion on January 11, 2018.

7

A.D. noted that he was arrested on May 1, 2016, and charged "shortly thereafter." He argued that the State had the DNA evidence from May 2016 on but waited until October 2016 to file a motion requesting permission to use up all the DNA in testing. He said that the trial court set a jury trial for January 17, 2017, but that on January 11, 2017, the court continued the jury trial to March 13. Then, A.D. argued that on March 1, the State filed an amended complaint charging a new crime, "the one crime that was charged originally was, I guess, dismissed or not filed." A.D. complained that the State received the DNA test results on January 25, 2017, but did not turn them over to A.D. until March 9, 2017. Then, the court set a trial date for July 31, 2017. He alleged that in July 2017, the State "decided to dismiss the case on their own without necessity" because the coroner had a conference on the scheduled trial date. A.D. summarized that the State had all necessary evidence since May 2016 but nevertheless had not gone to trial after 615 days. A.D. pointed out that he was 16 years old when he killed Walker, and he "spent over a year and a half in custody while [the case was] pending." A.D. acknowledged that the legal standard for juvenile prosecutions was "without unnecessary delay" instead of the regular speedy trial standard.

The State argued that the case filed in May 2016 should not be included in an unnecessary delay analysis. The State contended that the trial court should only count the case filed in July 2017 because they were "different cases." The State argued that it did not receive the DNA results until February and said that it mistakenly believed that it had turned over the results to A.D. before March. It argued that because there is no statute of limitations on murder, "we could have refiled that the day of or five years down the road."

Both parties agreed with the trial court when it describe the first delay:

> "And then the first continuance, the one in January of last year, this Court was
> required to attend a seminar in Topeka by the Kansas Supreme Court, along, I believe,

8

with six other judges from our county, so we had a shortage of judges, and the Court—
the Court had to order that continuance. I know Mr. House [A.D.'s counsel] objected,
even though the DNA evidence had not been even processed at that time. There was no
report. He objected, but the Court went ahead and did the continuance due to
unavailability of the Court."

The trial court further stated that, with respect to the delay from March 2017 to
July 2017, it "was holding the State responsible for some of the delay because the [DNA]
report was not given" to A.D., but that it did not believe the delay was intentional. The
court also acknowledged that part of the reason for the delay was its own calendar.
Ultimately, the court denied A.D.'s motion; it rejected both his unnecessary delay
arguments and his constitutional due process arguments.

On January 11, 2018, the State moved to have the case against A.D. designated as
an Extended Jurisdiction Juvenile Prosecution (EJJP) under K.S.A. 2017 Supp. 38-
2347(a)(2). The trial court held a hearing on the motion on February 28, 2018. The State
argued that the severity of the crime weighed in favor of an EJJP designation because
"protection of the community requires" it. The State alleged that the crime was
"committed in an aggressive, violent, premeditated and willful manner" and that the
physical evidence contradicted A.D.'s claims of self-defense. The State pointed out that
A.D. had been expelled from school for fighting in the year before the stabbing. The State
also alleged that A.D.'s psychological evaluation showed that he had symptoms of
narcissistic personality disorder. The State argued that it was "not sure that there's any
juvenile programs in the state which will successfully rehabilitate somebody with that
type of disorder."

A.D. opposed the State's motion. He argued that the stabbing was not committed
in an aggressive, premeditated, willful manner. He argued that he did not have a previous
pattern of antisocial behavior, physical violence, or contact with law enforcement.

In determining that the State had showed by a preponderance of the evidence, the trial court ruled that the case should be designated as an EJJP case—eligible for an EJJP sentence if A.D. was later convicted.

The case proceeded to a jury trial on April 9, 2018. The jury found A.D. guilty of second-degree murder. At sentencing, the trial court ordered that A.D. be detained in a juvenile correctional facility until he reached the age of 22 years and 6 months. Once he reached this mark, he will be placed on conditional release for six months. The court also imposed an adult sentence of 165 months that was stayed "so long as [A.D.] does not violate the provisions of the juvenile sentence or does not commit a new offense."

A.D. timely appealed. This case appeared on this court's July 2019 summary calendar. In August 2019, this court remanded the case to the trial court for further proceedings. In its remand order, this court explained that recent caselaw held that a juvenile has a constitutional right to a speedy trial. This court directed the trial court to hold an evidentiary hearing. That hearing would address the following points:  (1) whether the case proceeded without unnecessary delay as set forth in K.S.A. 38-2352; (2) the length of the delay; (3) the reason for the delay; (4) A.D.'s assertion of the right to a speedy trial; (5) whether there had been an extended period of pretrial incarceration and if so, what the trial court finds the length of pretrial incarceration to be; (6) whether there is any indication that the defense has been impaired by reason of the delay; (7) whether the trial court denied the State's July 2017 request for a continuance based on a lack of good cause; and (8) whether the State dismissed and refiled the charge against A.D. in bad faith.

The trial court held an evidentiary hearing in January 2020. The two assistant district attorneys who handled the case, Shannon Wilson and Donna Longsworth, testified at the evidentiary hearing. A.D. and his trial counsel, Stephen House, also

testified. Wilson and Longsworth testified to two main causes of delay in preparation for trial: the availability of DNA lab results and the unavailability of a necessary witness.

Longsworth explained that in September 2016 the Regional Forensic Science Center (the lab) had not yet tested the DNA samples and that testing would consume the samples. The State notified the trial court and House that testing would consume the DNA samples. House objected to the testing. The lab held the DNA evidence until the court denied House's objection. To allow time for the lab to test the DNA samples, the court continued trial to January 2017.

A change in judges resulted in another continuance, moving trial from January 2017 to March 2017. The State received DNA results from the lab showing the victim's DNA on the ornamental dagger and both knives, prompting the State to amend its complaint. Less than two weeks before the March trial, the State amended the charge from voluntary manslaughter to second-degree murder.

Wilson testified that she "had always felt very strongly that this was an intentional murder." She explained that the DNA results confirmed her belief by showing that A.D. used three separate knives. She and Longsworth believed that the voluntary manslaughter charge would essentially be conceding the self-defense argument and contesting only the reasonableness of that defense. Wilson and Longsworth elected to amend the complaint instead of dismissing and filing a new charge.

Trial was rescheduled for July 31, 2017. The trial court also scheduled a hearing on A.D.'s self-defense immunity claim just before trial, on July 27, 2017. Wilson called the coroner, Dr. Kipper, on July 26, 2017, to confirm he would be at the hearing the next day and trial the week after. Dr. Kipper told her that he would be at a professional conference in Maine the week of trial. Wilson immediately notified the court and House

that a necessary witness would be unavailable. Wilson explained why she called Dr. Kipper a necessary witness:

> "Because I couldn't have proceeded with our case without the forensic pathologist. It's a homicide. He's the only one that is capable of testifying as to cause and manner of death. And in this particular instance, the manner of death was the thing, for lack of a better term. The fact that there were 140 separate wounds on this victim, that was a vital component of our argument both at the immunity hearing and at trial. That is not something that we would have been able to put on, much less effectively put on, without Dr. Kipper."

No witness other than the forensic pathologist who examined the victim could testify about the number, placement, and type of wounds, or explain which wounds would have been fatal injuries.

Wilson asked the trial court about continuing the trial to the next week. Wilson testified that they had no interest in delaying the trial but could not proceed without Dr. Kipper. House opposed the continuance, and the court denied the State's request. Wilson testified that the State was prepared to fund Dr. Kipper's flights from Maine and back to make him available for trial, but the time constraints of his conference did not allow for this possibility. Wilson asked the court if they could record Dr. Kipper's testimony at the immunity hearing that day and play it the next week for the jury as a video deposition. The court determined that none of the exceptions in K.S.A. 22-3211 applied to allow for playing a video deposition for the jury.

Wilson further testified that she and Longsworth had suggested to House that they could have Dr. Kipper appear through Skype at trial. House indicated that he would object to the witness appearing remotely. As a result, Wilson and Longsworth did not offer that suggestion to the trial court.

12

The State did suggest "sort of a bifurcated version of the trial" where they would present all the State's evidence except Dr. Kipper's testimony. Then, the jury would be released until the following Monday when Dr. Kipper returned from Maine and testified at trial. After the trial court denied the State's requests to accommodate for Dr. Kipper's appearance, the State dismissed the case against A.D. and filed a new complaint in the same day.

House testified after Wilson and Longsworth at the remand hearing. He stated that the theory of defense from the outset of the case was that A.D. killed the victim in self-defense. He also confirmed that he rejected the State's suggestion for Dr. Kipper to appear by Skype.

Finally, A.D. testified about how long he remained in custody and about the stress and anxiety involved in waiting to go to trial.

After the evidentiary hearing on remand, the trial court ruled that A.D.'s speedy trial rights were not violated and that his case proceeded without unnecessary delay.

ANALYSIS

*Did the trial court err by denying A.D.'s motion for immunity from prosecution?*

A.D. argues that the trial court erred in finding that the State showed probable cause that his use of deadly force was not justified. The State contends that the physical evidence contradicted A.D.'s claim that he was defending himself against rape.

To overcome a defendant's immunity claim under K.S.A. 2015 Supp. 21-5231, the State must establish probable cause that an ordinarily prudent and cautious person could reasonably believe the defendant's use of force was not justified under either or both of

two scenarios: (1) the defendant did not honestly believe the use of force was necessary under the circumstances or (2) a reasonable person would not believe the use of force was necessary under the circumstances. *State v. Thomas*, 311 Kan. 403, 412, 462 P.3d 149 (2020).

When evaluating a claim of self-defense immunity under K.S.A. 2015 Supp. 21-5231, the trial court must exercise its gatekeeping function and consider the totality of the circumstances, weigh the evidence without deferring to the State, and determine whether the State has established probable cause that the defendant's use of force was not statutorily justified. *State v. Hardy*, 305 Kan. 1001, 1011, 390 P.3d 30 (2017).

In reviewing a trial court's ruling on a motion to dismiss based on immunity under K.S.A. 2015 Supp. 21-5231, the appellate courts apply a bifurcated standard of review of the court's probable cause determination. Thus, when the lower court's factual findings arise out of disputed evidence, the appellate court will determine whether the findings are supported by substantial competent evidence. The appellate court will not reweigh the evidence. The ultimate legal conclusion of whether the facts so found arise to the level of probable cause is a legal conclusion reviewed de novo. *Hardy*, 305 Kan. at 1012.

When there are no disputed material facts on a motion under K.S.A. 2015 Supp. 21-5231, the appellate court is presented with a pure question of law over which it exercises unlimited review. *Hardy*, 305 Kan. at 1012.

A.D. moved for immunity from prosecution under K.S.A. 2015 Supp. 21-5231. A.D.'s theory of immunity was that he reasonably believed that Walker was trying to rape or commit aggravated criminal sodomy against him. As a result, he used lethal force justifiably in self-defense. Under Kansas law, rape and aggravated criminal sodomy constitute great bodily harm crimes. *State v. Gideon*, 257 Kan. 591, 614, 894 P.2d 850 (1995). After an evidentiary hearing and supplemental briefing, the trial court ruled that

14

A.D. was not immune from prosecution because the State had shown probable cause that his use of deadly force was not justified.

On appeal, A.D. argues that the trial court's "findings were not supported by substantial competent evidence, nor was the district court's legal conclusion that the state met its burden of probable cause . . . appropriate." He contends that "[w]hile the State may have cast doubt on Appellant's version of events, it was unable to controvert it or demonstrate evidence to the contrary."

As the State correctly points out, the testimony from the State's witnesses, as well as the testimony elicited from A.D.'s witnesses at cross-examination, supports a finding of probable cause that A.D.'s use of lethal force was not justified. The State's witnesses testified that the physical evidence often contradicted or did not support A.D.'s claim of self-defense. Also, the State elicited testimony from A.D.'s witnesses that drew A.D.'s credibility into question and made his account seem improbable.

When cross-examining A.D., the State highlighted A.D.'s unusual story of why he went to Walker's apartment in the first place, as in the following exchange:

"Q. So this strange man that you have never met before takes you over to [Walker]'s house, who you've also never met before, and you are there for three minutes; is that right?
"A. Yes, ma'am.
"Q. And during that time your phone that's at 98 percent needs to be charged, so you leave your charger there; is that right?
"A. Yes, ma'am. I had plugged it up to charge my phone, because I figured I was going to be out all day, so I needed to walk around with a full battery, so just in case my mother or anybody else needed to get into contact with me, my phone would be charged.

"Q. So the answer to my question is, yes, your phone was at 98 percent but you charged it during the three minutes you were at [Walker]'s house to get it up to 100; is that right?

"A. Yes, ma'am. It didn't—

"Q. Okay. I haven't asked the question yet.

    Now, in looking back at your statement, if I am understanding correctly, you didn't like [Walker] in that three minutes. Is that a fair statement?

"A. I was uncomfortable, ma'am.

"Q. In fact, [Walker] gave you, I believe you told Detective Tennyson, a weird-ass vibe. Is that what you told Detective Tennyson?

"A. Yes, ma'am.

"Q. And that sometimes people just rub you the wrong way and [Walker] was one of those people?

"A. Yes, ma'am.

"Q. And that, in fact, [Walker] was—I believe the term you used was sketching you out.

"A. Yes, ma'am."

The State here cast considerable doubt on A.D.'s credibility and explanation for going to Walker's apartment in the first place. A reasonable person could question the trial testimony of A.D.: To illustrate, A.D. walked to an apartment with an acquaintance he barely knew; he immediately developed a dislike for the apartment's occupant [Walker] on meeting her; he decided he needed to increase the battery charge level of his phone, which was 98%; he left his charger at Walker's apartment after staying there for only three minutes; he decided to return alone the next day to Walker's apartment to retrieve his battery charger—even though the day before, Walker had flirted with him and called him a "Chocolate Knight"; and he decided to bring a dagger and two pocketknives with him on returning to Walker's apartment the next day. Because A.D.'s explanation for going to Walker's apartment and his reason for returning to his apartment the next day borders on the frivolous, a reasonable person could conclude that A.D.'s testimony was so improbable as to be unworthy of belief.

16

Now we turn our attention to the facts about the altercation. A.D. testified that Walker hit him "fairly hard" on the right side of his head, causing him to fall. A.D. did not have any blood or visible injuries to his face or head, although his scalp was not entirely visible because of his hairstyle. Meanwhile, Walker had "multiple sharp force injuries, incised wounds to the hands." These wounds "could be consistent with defensive wounds by either blocking or trying to grab a knife that's being thrust forward." Walker also had many "penetrating wounds" on the back of her neck, the back of her shoulder, her upper back, and on her head. In total, Walker had "140 different stab or incised wounds." To a reasonable person, the type and extent of Walker's injuries, when compared to A.D.'s overall lack of physical injury, could contradict A.D.'s account of self-defense.

The State also emphasized that A.D.'s testimony about his clothing was unbelievable and unreliable. A.D. testified that when he went to Walker's apartment, he wore a camouflage coat and a button-up shirt with a black Chicago Bulls shirt underneath. He wore red underwear, gray athletic shorts, and jeans, as well as black sneakers and white socks. A.D. told Detective Tennyson that at some point before the struggle, he took off the coat. A.D. testified that he took off his shoes inside Walker's front door. A.D. testified that during the struggle, he fell to the ground, then:

> "[Walker] had charged me and tried to pull me back by my pants. [She] had [her] fingers like on my waist. And when [she] was pulling, I tried to wiggle out of my pants and stuff, and they had all come off. And at that time I tried to get up and leave again. And [she] pulled me back by my shirts, and I wiggled out of my shirts."

Detective Tennyson testified that when A.D. recounted the struggle to her shortly afterwards, A.D. stated that Walker was able to pull off his jeans, athletic shorts, boxers, and socks "simultaneously[,] . . . [i]n one fell swoop." A.D. also recounted that he could "feel [Walker's] fingers" as she removed his clothing. Strikingly, A.D. testified that he

managed to "wiggle out of" three layers of clothing while struggling with Walker. Nevertheless, A.D.'s clothing was not stretched and did not have any tears, nor did A.D. have any scratches, cuts, or marks on the back of his neck where he said Walker grabbed him. The conflict between the physical evidence and A.D.'s account could cause a reasonable person to conclude that it was more likely than not that A.D. was not stripped of his clothing during a struggle with Walker, casting doubt on A.D.'s claim that he feared he would be raped.

A.D. testified that he felt what he thought was Walker's penis on his leg as Walker stripped him. The State pointed out that no DNA from A.D. was found on Walker's penis. A.D.'s DNA was also not found on the dildo in the room near Walker's body. A.D. showered at his friend's house after the stabbing and refused a SANE exam, precluding examination of his body for Walker's semen or other fluids.

Also, A.D. testified that he used only the ornamental dagger to stab Walker. Nevertheless, the State submitted evidence that Walker's blood was found on the blade of the ornamental dagger, the blade of the pocketknife, and the blade of a Swiss Army-style knife that A.D. also had in his possession. Again, this discrepancy between A.D.'s account and the physical evidence could cause a reasonable person to doubt A.D.'s credibility and his account of the altercation he had with Walker.

On this record, the evidence could cause an ordinarily prudent and cautious person to reasonably believe that A.D.'s use of force was unnecessary under the circumstances. See *Thomas*, 311 Kan. at 412. Thus, the trial court properly denied A.D.'s motion for immunity under K.S.A. 2015 Supp. 21-5231.

*Did the trial court err in denying A.D.'s motion to dismiss the case for unnecessary delay and violation of his right to a speedy trial?*

A.D. argues that the State violated his statutory right for a juvenile case to proceed "without unnecessary delay" and his constitutional right to a speedy trial. The State argues that the case it filed in 2016 proceeded without unnecessary delay or a violation of A.D.'s constitutional speedy trial right. The State asserts that the same is true of the case filed in 2017. The State argues that the two cases do not combine for calculating speedy trial because the State dismissed the charge against A.D. and refiled it in good faith.

Under K.S.A. 2017 Supp. 38-2352: "All cases filed under the [Juvenile Justice] code shall be heard without unnecessary delay. Continuances may be granted to either party for good cause shown." A.D. argues that his case should have been dismissed for unnecessary delay because 709 days passed between his arrest and his trial. The State disagrees, arguing that A.D. failed to show unnecessary delay because none of the continuances in the 2016 case or the refiled 2017 case lacked good cause.

K.S.A. 2017 Supp. 38-2352 does not define "unnecessary delay." Neither this court nor our Supreme Court has defined unnecessary delay for the purposes of this statute.

A.D. further argues that the State violated his right to a speedy trial under the Sixth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. Juvenile offenders have the same right to a speedy trial as adults. *State v. Robinson*, 56 Kan. App. 2d 567, 568, 434 P.3d 232 (2018). A.D. contends that the trial court erred by not dismissing his case.

In the motion to dismiss that A.D. filed with the trial court, A.D. based his claims of unnecessary delay and violation of speedy trial on the following timeline, which the parties do not seem to dispute:

- On May 1, 2016, police arrested A.D. on a charge of voluntary manslaughter.
- The State filed its first complaint against A.D. on May 4, 2016.
- In October 2016, the State notified counsel for A.D. that it intended to conduct DNA testing on materials related to the crime charged, consuming the samples.
- The trial court continued the jury trial from January 2017 to March 2017 because of a shortage of available judges. A.D. objected to the continuance.
- In late January 2017, the State received the DNA testing results.
- On March 1, 2017, the State amended the complaint to charge A.D. with murder in the second degree, in violation of K.S.A. 2015 Supp. 21-5403(a)(1).
- On March 9, 2017, the State provided defense counsel with the DNA testing results.
- On March 13, 2017, the trial court granted A.D.'s request to continue the jury trial to July 31, 2017, because the State had just amended the complaint and because A.D.'s counsel "had just been given the DNA report."
- On July 27, 2017, the State requested that the trial court continue the jury trial, which was scheduled for July 31, 2017. A.D. opposed. The court denied this continuance, stating that the State had failed to show good cause.
- After the trial court denied the State's request for a continuance, the State dismissed the 2016 case and refiled a new second-degree murder charge that same day, July 31, 2017.
- On January 8, 2018, A.D. moved to dismiss the charge against him for unnecessary delay and for violating his rights to constitutional due process and a speedy trial. A.D. argued that the trial court should consider both the 2016 case and the 2017 case together to determine unnecessary delay.

20

- On January 11, 2018, the trial court held a hearing on A.D.'s claim alleging unnecessary delay in the proceedings and violation of his right to constitutional due process and a speedy trial. After considering the argument of counsel, the court denied the motion.

At the January 2018 hearing, the trial court analyzed A.D.'s constitutional speedy trial right and his statutory right for his juvenile offender case to proceed without unnecessary delay. Before making any findings of fact or conclusions of law on A.D.'s claim of unnecessary delay under K.S.A. 2017 Supp. 38-2352, the court specifically expressed concern about the amount of time that A.D. had been detained. The court then reviewed the case timeline.

The trial court considered each continuance in both cases: the one filed in 2016 and the new one filed in 2017. The court found good cause to continue trial from January 17, 2017, to March 13, 2017 (shortage of available judges). But the court determined the State somewhat responsible for the four-month delay from March 2017 to July 2017. Even though A.D. requested the continuance, he did so because the State amended the complaint and provided DNA test results just before the March trial date. The court did not find good cause to continue the July 31, 2017 trial to a later date, prompting the State to dismiss its complaint and file a new one the same day. The court noted that the new case was on its first trial setting. The court determined that in each case, examined separately, there were no unnecessary delays. In the first case, the continuances granted were for good cause. In the second case, there had been no continuances as of January 2018.

The trial court then analyzed A.D.'s constitutional speedy trial claim. A trial court must apply the four-factor balancing test from *Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972), to determine if a juvenile's constitutional right to a speedy trial has been violated. *Robinson*, 56 Kan. App. 2d at 572-73. These factors are

21

the following: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right to a speedy trial, and (4) the prejudice incurred by defendant. *Barker*, 407 U.S. at 530. Ultimately, the court denied A.D.'s motion to dismiss after analyzing those factors.

For the first two *Barker* factors, the trial court expressed its concern about the total passage of time from A.D.'s arrest to his jury trial. But the court also stated that the 2017 case had no delay and pointed to its earlier statement that the continuances in the 2016 case were granted for good cause. On the third *Barker* factor, the court determined that A.D. continually asserted his right to a speedy trial. Finally, the court determined that A.D. was not prejudiced by any delay because his defense remained unchanged, particularly his own testimony supporting his defense. The court noted that the only people who knew what happened in that apartment were A.D. and Walker, and A.D.'s testimony remained unchanged. The case was tried, and a jury convicted A.D. of second-degree murder in April 2018.

On appeal, this court ordered the case remanded to the trial court for further findings on the issues of speedy trial and unnecessary delay. Part of the reason for the remand stemmed from the process inherent in appellate review: reading a cold transcript. In its findings at the January 2018 hearing on the motion to dismiss, the court contradicted itself in two sentences: "But even if you look at the totality of both cases, I do not find any delay was necessary. They were—it was without unnecessary delay." In the first sentence, no delays were necessary; then in the second sentence, no delays were unnecessary. In its remand order, this court described the court's ruling as confusing and contradictory. After remand, the court made clear that the second sentence was a correction—not a contradiction. Rather, the court determined that all delays were necessary but misspoke, and then corrected its ruling. But this determination was ambiguous from the hearing transcript.

On remand, the trial court held an evidentiary hearing in January 2020 and oral argument in December 2020. COVID-19 caused this lengthy delay between hearings. And the court did not file its journal entry on the December 2020 hearing until May 2021 because of COVID-19. The court ruled that A.D.'s case was heard without unnecessary delay under K.S.A. 2017 Supp. 38-2352. The court also ruled that there was no violation of A.D.'s constitutional right to a speedy trial.

On the issue of unnecessary delay, the trial court focused on the 2017 case. After the State refiled the charge on July 31, 2017, the first appearance was in August 2017 and trial was set for January 2018. In January 2018, just before trial, the court heard A.D.'s motion to dismiss and noted that there had been no continuances. All continuances to that point had happened in the 2016 case. But the State then filed its EJJP motion and a motion in limine on January 11, 2018, leading to the court granting A.D.'s continuance request as necessary to prepare for trial. On the first day of trial, A.D. again moved to dismiss, but the court ruled that the delay from January 2018 to April 2018 was a necessary delay.

The trial court's May 2021 order after remand then explained why it considered only the 2017 case rather than combining the 2016 and 2017 cases. The court determined that the State did not dismiss and refile the charge in bad faith: "The State's only reason for dismissing the case was because it could not proceed to trial without Dr. Kipper as a necessary witness to testify about the cause and manner of death." The standard for the State dismissing and refiling charges is "necessity." *State v. Gill*, 48 Kan. App. 2d 102, Syl. ¶¶ 6-7, 283 P.3d 236 (2012).

Under *Gill*, the State's dismissal and refiling of charges is in bad faith if done to avoid speedy trial implications. See, e.g., *State v. Anunda*, No. 110,629, 2015 WL 967548, at *6 (Kan. App. 2015) (unpublished opinion). But the State does not act in bad faith if the charges are dismissed and refiled out of necessity. The trial court held that the

23

State showed necessity here analogous to the showing of necessity in *State v. Ransom*, 234 Kan. 322, 673 P.2d 1101 (1983). In *Ransom*, the State requested a continuance of the trial date because of difficulty with ensuring that three witnesses would be available for trial. Two of the witnesses were doctors who would be out of state for professional commitments. The court denied the State's continuance. The State dismissed its case and refiled the same charges four days later. Our Supreme Court ruled that no speedy trial violation occurred. 234 Kan. at 327-28.

Here, Dr. Kipper was in a similar position as Dr. Alex Scott in *Ransom*. Dr. Scott was a necessary witness at Ransom's rape trial to lay the foundation for DNA evidence. Another doctor had examined the rape victim and Dr. Scott examined the defendant. Seven days before trial, the State moved for a continuance because Dr. Scott would be in New York City "attending a professional meeting for which he has had a long standing commitment." *State v. Ransom*, 233 Kan. 185, 194, 661 P.2d 392 (1983) (McFarland, Miller, and Herd, JJ., dissenting). Here, four days before A.D.'s murder trial, the State moved for a continuance because Dr. Kipper would be attending a professional meeting in Maine. Thus, the trial court ruled that the showing of necessity in *Ransom* served as a useful example here. The court ruled that the State dismissed and refiled the case against A.D. based on necessity because the State could not proceed to trial when a critical and necessary witness was unavailable.

The trial court then analyzed A.D.'s constitutional speedy trial rights under the same conclusion: The State did not dismiss and refile the charge in bad faith. So the court applied the *Barker* factors to only the 2017 case and determined that those factors weighed in the State's favor.

On the first factor, the length of delay, the trial court found that the length of delay was 252 days, or 8.5 months. The court arrived at this figure by counting from when the State refiled the case on July 31, 2017, to the trial date of April 9, 2018. On the second

factor, the reason for delay, the court first recounted the continuances granted for good cause in the 2016 case before concluding that, ultimately, the only relevant time frame is the time after the State refiled the case in 2017. On the third factor, assertion of speedy trial rights, the court ruled that A.D. had asserted his rights throughout the case, with few exceptions. And on the fourth factor, prejudice from the delay, the court noted three interests that the speedy trial right was designed to protect. The right to a speedy trial is supposed to prevent oppressive pretrial incarceration, minimize anxiety and concern of the accused, and limit possible impairment of the defense. *State v. Owens*, 310 Kan. 865, 880, 451 P.3d 467 (2019). The court noted that A.D. spent much of the pretrial process incarcerated and was only released on pretrial supervision just two months before trial. The court acknowledged the stress and anxiety that A.D. testified about at the remand hearing. But the court ruled that the prejudice factor favored the State overall because A.D.'s defense was not impaired. A.D. and the victim were alone when A.D. killed him, and A.D.'s version of events remained consistent from what he told police the night of the crime through the jury trial.

Thus, the trial court reconsidered its ruling on A.D.'s motion to dismiss, as instructed by the remand order, and denied A.D.'s motion a second time.

The State and A.D. filed supplemental briefing with this court within 20 days of the trial court's journal entry. A.D. prioritized the issues, correctly putting the bad faith question first.

> "Although the question of bad faith/whether the 2016 and 2017 cases should be considered together was the final question posed by the Court of Appeals upon remand, it is quite possibly the most important inquiry and is certainly a threshold issue for consideration of other factors, as it will dictate the date calculations herein."

A.D. is correct that bad faith is the threshold question here. The trial court ruled that the State did not dismiss and refile case in bad faith but did so because of necessity. The court was guided in its interpretation of necessity by the *Ransom* holding, examining how the State was hampered and prevented from proceeding to trial because of the unavailability of indispensable witnesses.

A.D. seeks to distinguish this case from *Ransom*, maintaining that the State in *Ransom* anticipated the scheduling conflict and sought a different trial setting with 59 days remaining on its statutory 180-day speedy trial clock. A.D. argues that his case is different because the scheduling conflict was the State's fault, and it was not addressed until the eve of trial. But A.D. makes a dissimilar comparison, comparing time left for speedy trial in *Ransom* with the actual date of trial here. In comparing a similar situation with another similar situation, the State in *Ransom* requested a continuance seven days before trial. While here, the State requested a continuance four days before trial.

As for whether the scheduling conflict is the State's fault, it is not clear that this case differs at all from *Ransom*. Here, the stipulated facts state that Dr. Kipper notified the district attorney's downtown case coordination office of his schedule. But this was a juvenile case, and the Sedgwick County district attorney's office had a separate juvenile case coordination office. Neither Dr. Kipper nor the downtown office passed this information on to the juvenile case coordinators. A.D. claims that the district attorney's office's failure to communicate internally makes this case different from *Ransom*, requiring a different outcome. But Dr. Scott in *Ransom* had a "long-standing commitment" to attend a professional meeting. None of the three *Ransom* cases explain how the State overlooked Dr. Scott's conflicting event even though it was scheduled well in advance. See *State v. Ransom*, 239 Kan. 594, 596-97, 722 P.2d 540 (1986); *Ransom*, 234 Kan. at 322-23, 326; *Ransom*, 233 Kan. at 186, 194-95. There is no indication if Dr. Scott failed to notify anyone or notified the wrong office. Thus, it is not clear that the facts here distinguish this case from *Ransom*.

Nevertheless, A.D. contends that the State dismissed the charge and refiled the charge in bad faith. In other words, the State sought to avoid speedy trial implications. This part of A.D.'s argument runs counter to the trial court's factual findings. The court held an evidentiary hearing where the attorneys testified about how the case proceeded. Appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018). To the extent that A.D.'s argument would require this court to evaluate witness testimony and determine the State's motivations, his argument must fail.

But A.D. also contends that the effect matters at least as much as motivation. He notes that the issue involving Dr. Kipper was not the only error, noting the delay in DNA results and the late-filed EJJP motion. He argues that clerical and prosecutorial errors can violate speedy trial rights regardless of intent, citing a New York City Criminal Court case: "Whether mistakes are caused by prosecutorial laxity, ministerial error or sheer inadvertence, the weighty interests embodied by [speedy trial rights] cannot tolerate such lapses, no matter how well-intentioned the prosecutor may be." *People v. Mascali*, 189 Misc. 2d 549, 550, 736 N.Y.S.2d 839 (Crim. Ct. 2001). Thus, A.D. argues that even if the State did not intend to avoid speedy trial issues, the result was that dismissing and refiling the charge delayed A.D.'s jury trial.

A.D. makes a telling point. But the law in Kansas is controlled by the precedents of *Gill* and *Ransom*. To avoid speedy trial issues, the State must show that it dismissed and refiled charges from necessity. *Ransom*, 234 Kan. 322, Syl. ¶¶ 1-2; *Gill*, 48 Kan. App. 2d 102, Syl. ¶ 7. The State shows necessity when it dismisses and refiles charges because a necessary witness is unavailable. *Ransom*, 234 Kan. at 326-27; see *State v. Cadle*, No. 111,369, 2015 WL 4366461, at *6-9 (Kan. App. 2015) (unpublished opinion). Here, the trial court properly ruled that the State showed necessity when it dismissed the charge and refiled the charge against A.D. Thus, the State did not dismiss and refile the charge against A.D. in bad faith.

27

*Did the trial court err by granting the State's motion for extended jurisdiction juvenile prosecution?*

A.D. argues that the trial court erred by granting the State's motion for an EJJP. An EJJP differs from other juvenile offense prosecutions because it contains the possibility of imposing an adult sentence as follows:

"(a) If an extended jurisdiction juvenile prosecution results in a guilty plea or finding of guilt, the court shall:

"(1) Impose one or more juvenile sentences under K.S.A. 2017 Supp. 38-2361, and amendments thereto; and

"(2) impose an adult criminal sentence, the execution of which shall be stayed on the condition that the juvenile offender substantially comply with the provisions of the juvenile sentence and not commit a new offense." K.S.A. 2017 Supp. 38-2364.

If a juvenile offender violates one or more conditions of the juvenile sentence, then the court shall hold an evidentiary hearing. If the court finds by a preponderance of the evidence that the juvenile committed a new offense or violated one or more conditions of the juvenile's sentence, the court shall revoke the juvenile sentence. Then, the court imposes either the original adult sentence or, upon agreement of the county or district attorney and the juvenile offender's attorney of record, a modified adult sentence. Juvenile court jurisdiction terminates, and adult court assumes jurisdiction. K.S.A. 2017 Supp. 38-2364(b).

K.S.A. 2017 Supp. 38-2347(a) describes how a juvenile prosecution becomes an EJJP as follows:

"(2) At any time after commencement of proceedings under this code against a juvenile offender for an offense which, if committed by an adult, would constitute an off-grid felony or a nondrug severity level 1 through 4 person felony, and prior to the beginning of an evidentiary hearing at which the court may enter a sentence as provided

28

in K.S.A. 2017 Supp. 38-2356, and amendments thereto, the county or district attorney or the county or district attorney's designee may file a motion requesting that the court designate the proceedings as an extended jurisdiction juvenile prosecution.

"(3) If the county or district attorney or the county or district attorney's designee files a motion to designate the proceedings as an extended jurisdiction juvenile prosecution, the burden of proof is on the prosecutor to prove the juvenile should be designated as an extended jurisdiction juvenile."

K.S.A. 2017 Supp. 38-2347(d) provides eight factors trial courts shall consider when designating a case as an extended jurisdiction juvenile case. The eight factors are as follows:

"(1) The seriousness of the alleged offense and whether the protection of the community requires prosecution as an adult or designating the proceeding as an extended jurisdiction juvenile prosecution;

"(2) whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner;

"(3) whether the offense was against a person or against property. Greater weight shall be given to offenses against persons, especially if personal injury resulted;

"(4) the number of alleged offenses unadjudicated and pending against the juvenile;

"(5) the previous history of the juvenile, including whether the juvenile had been adjudicated a juvenile offender under this code or the Kansas juvenile justice code and, if so, whether the offenses were against persons or property, and any other previous history of antisocial behavior or patterns of physical violence;

"(6) the sophistication or maturity of the juvenile as determined by consideration of the juvenile's home, environment, emotional attitude, pattern of living or desire to be treated as an adult;

"(7) whether there are facilities or programs available to the court which are likely to rehabilitate the juvenile prior to the expiration of the court's jurisdiction under this code; and

> "(8) whether the interests of the juvenile or of the community would be better served by criminal prosecution or extended jurisdiction juvenile prosecution." K.S.A. 2017 Supp. 38-2347(d).

Here, the State moved to designate the case against A.D. as an extended jurisdiction juvenile case. The State argued that A.D.'s offense was very serious and necessitated protection of the community because A.D. was charged with second-degree murder. The State also argued that A.D. committed the offense "in an aggressive, violent, premeditated and willful manner." The State pointed out that A.D. brought two knives and a dagger to Walker's house, and Walker's blood was found on the dagger and both of the knives. The State also noted that the crime was exceptionally violent because A.D. stabbed Walker 140 times. The State also pointed out that A.D. testified that he told Walker that he would go get help, but he did not call the police. Instead, he went to his friend's apartment, called his mother, showered, and waited for his mother to arrive. His mother called the police.

As for A.D.'s history, the State stated that A.D. had been expelled from school for fighting—the year before the incident with Walker. The State also explained that A.D.'s psychological evaluation suggested that he desired to be treated as an adult and that he lacked empathy. So the State argued that it was "not sure that there's any juvenile programs in the state which will successfully rehabilitate" A.D.

A.D. opposed the motion. He agreed that the offense was violent but disagreed that it was premeditated. He argued that the attack "wasn't willful in that it was a response to being attacked and trying to be raped."

In ruling on the EJJP motion, the trial court recalled the testimony from the immunity hearing. The court noted that A.D. armed himself with the two knives and dagger and inflicted 140 wounds on Walker. The court stated that it gave little weight to

the previous school fight. Also, the court noted A.D.'s reported lack of empathy. The court found that by a preponderance of the evidence, the case against A.D. should be designated as an EJJP case.

This court reviews the trial court's assessment of the eight statutory factors for an abuse of discretion. *In re D.D.M.*, 291 Kan. 883, 893, 896, 249 P.3d 5 (2011). This court reviews the factual findings underpinning the trial court's assessment for substantial competent evidence. 291 Kan. at 893. Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019).

On appeal, A.D. argues that the trial court lacked substantial competent evidence for its factual findings that the crime was violent and against a person. He further argues that the court "did not give adequate weight to Appellant's self-defense claims." A.D. asks this court to reweigh the evidence on appeal to give additional weight to his claims of self-defense and lack of previous adjudications. This court cannot reweigh evidence when reviewing for substantial competent evidence. *In re D.D.M.*, 291 Kan. at 893. The uncontroverted testimony from the immunity hearing—that A.D. brought two knives and one dagger to Walker's apartment before fatally stabbing her 140 times—provides substantial competent evidence for the court's factual conclusion that A.D.'s alleged offense was violent and premeditated. Thus, this case warranted an EJJP determination.

For the preceding reasons, we affirm.

Affirmed.